Richard D. and Mabel C. BURDEN, Plaintiffs–Appellants, Cross–Appellees,

v.

EVANSVILLE MATERIALS, INC., Defendant–Appellee, Cross–Appellant.

Nos. 86–5327, 86–5388.

United States Court of Appeals, Sixth Circuit.

Argued July 31, 1987.

Decided Feb. 25, 1988.

---

Hugh D. Moore (argued), Moore, Moore and Malone, Owensboro, Ky., for plaintiffs-appellants, cross-appellees.

John L. Tate (argued), Stites and Harbison, Louisville, Ky., for defendant-appellee, cross-appellant.

Before KENNEDY and NELSON, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

Richard D. Burden, a deckhand on an Ohio River tugboat, hurt his back while moving coils of wire cable from the tug to an adjacent barge. Mr. Burden and his wife sued the tugboat owner for damages under the Jones Act, 46 U.S.C. § 688, and general maritime law.

The district court, sitting without a jury, determined that Mr. Burden's injury was a proximate result of unseaworthiness and of negligence on the part of the defendant. The court further found that 80% of the plaintiffs' damages were attributable to contributory negligence on the part of Mr. Burden. The court therefore entered judgment for an amount that included 100% of the cost of Mr. Burden's maintenance and cure, plus 20% of the plaintiffs' remaining damages. (The latter included pain and suffering, Mr. Burden's accrued and prospective wage loss, and Mrs. Burden's loss of consortium.)

The court found that although Mr. Burden could no longer work as a deckhand, he was not totally disabled. In computing his damages, therefore, the court took into account the present value of his probable future earnings, using the lawful minimum wage as the measure of earning capacity. (The court found that after his injury Mr. Burden probably could not earn more than the minimum wage.)

The district court's findings and conclusions are set forth in a comprehensive memorandum opinion published at 636 F.Supp. 1022.

The plaintiffs have appealed, contending that the district court erred both in reducing the award on account of contributory negligence and in factoring into the damage calculation an element for post-injury minimum wage employment. The defendant has cross-appealed, contending that the evidence supported neither the finding that the vessel was unseaworthy nor the finding that the defendant was negligent. None of the assignments of error strikes us as well taken, and we shall affirm the judgment of the district court.

I

Mr. Burden testified that his injury occurred on the afternoon of August 13, 1980. At the start of Mr. Burden's watch that afternoon the tugboat captain (who

happened to be Mr. Burden's brother) told him to go out to the head of the tug, where there were two waist-high piles of coiled towing cables, and move "as many [of the cables] as possible" to the adjacent barge so that the deck of the tug could be made ready for painting. Mr. Burden repeatedly testified that his brother had told him to do only as much of the job as possible:

> "My brother, captain of the boat, told me to move them, get the job done, do as much as possible, *didn't have to get the job done, just do as much as possible.*" (Emphasis supplied.)

The accepted method for moving a coiled cable, as the evidence indicated, would be for the deckhand to place the coil in a vertical position, lift it up with one shoulder, and step from the tug to the adjacent barge while carrying the coil on the shoulder. Plaintiff Burden had prior experience in handling such coils, and he testified that when he had performed this task in the past "I would put the coil on my shoulder and pack it out on the barge."

On this particular day, however, plaintiff Burden elected to use a different procedure. Instead of putting a coil on his shoulder and "packing" it over to the barge, he decided that he would "slide" or "drag" the coil to the edge of the tugboat and then "throw" it on the barge. Each coil weighed a little under 100 pounds. When asked by his counsel why he had not shouldered the coils on this occasion, plaintiff Burden replied, in substance, that the coils had to be moved only a short distance and he thought the "drag and throw" method would be quicker and easier:

> "I didn't see no need, no further [distance] than it had to go[,] taking the time to put it on my shoulder and packing it over there and laying it down, because—I done the job the easiest and quickest way I thought I could do it."

In an unguarded hallway conversation with another witness during the trial, plaintiff Burden admitted that "he got in a hurry and did not lift in a proper way." There was no indication that his brother, the captain, had put any pressure on him to hurry, and there was ample evidence to support the trial court's finding that the trip up the river, which lasted several days, was a "somewhat leisurely" one.

After Mr. Burden had moved about half of each stack of coils, he encountered difficulty in freeing a coil from the one beneath it. The coils had probably become caught on one another by a shackle-and-chain attachment left on a cable after it had been used for towing. (It was standard procedure to strip the cables of these fittings before coiling if possible, but sometimes it was found that the shackles could not be removed without a cutting torch; when that happened the shackles might be left in place. Mr. Burden could not say that a shackle had been left on the particular cable he was dealing with when he hurt his back, but he testified without contradiction that a few of the coils did have their shackles still attached.)

Instead of abandoning the task when he found he could not pull the coil off the pile in the usual manner, and instead of requesting help from a "call watch" deckhand who was in his bunk at the time, Mr. Burden apparently reached over, placed one hand on each side of the snagged coil—which had a diameter of about three feet and would have been on top of a pile perhaps 18 inches high—and lifted the coil straight up. It was when he straightened up, Mr. Burden testified, that "I felt ..., something wrong with my back."

Asked what he did next, Mr. Burden replied that "I stood there for a minute, then scooted it over there like I always did and tossed the cable onto the barge." His testimony continued as follows:

> "Q. And then what happened?
>
> A. Well that's when I knew I had done something worser to my back, because it hit me more.
>
> * * * * * *
>
> Q. Did you move any more cables after that?
>
> A. No sir I didn't."

When asked on cross examination to confirm that "it was while you were in the act of throwing [the coiled cable] ... that you

really felt something in your back," Mr. Burden answered, "Yes. That is correct."

In analyzing the question whether the vessel owner had sustained its burden of establishing the affirmative defense of contributory negligence, the district court relied heavily upon our opinion in *Tolar v. Kinsman Marine Transit Co.*, 618 F.2d 1193 (6th Cir.1980). That opinion recognized that "assumption of risk is not a defense to a seaman's claim for injuries aboard ship" (see *Socony–Vacuum Oil Co. v. Smith*, 305 U.S. 424, 432, 59 S.Ct. 262, 267, 83 L.Ed. 265 (1939)), but further recognized that "contributory negligence is a valid defense in an action of this kind, though it results in an allocation of fault on a comparative basis rather than a bar to recovery." *Tolar*, 618 F.2d at 1195. In explaining the distinction between assumption of risk and contributory negligence in a maritime setting, we went on to say, in a passage quoted by the district court at 636 F.Supp. 1035, that

> "[a] seaman may not be denied recovery because he proceeds in an unsafe area of the ship or uses an unsafe appliance in absence of a showing that there was a safe alternative available to him.... To determine whether plaintiff was guilty of contributory negligence we must focus on his actions after he assumed the risk of working with the defective rig since the defense of contributory negligence requires evidence of some negligent act or omission by the plaintiff other than his knowledgeable acceptance of a dangerous condition." *Tolar*, 618 F.2d at 1195–96.

After noting that the evidence in the case at bar established liability both on the basis of unseaworthiness and Jones Act negligence, but stating that the defendant was not completely at fault, the district court went on to observe that "[a]s *Tolar, supra,* requires, the Court must focus on the injured seaman's actions after assuming the risk of working with the defective equipment. It is imperative that there is evidence of some negligent act or omission by the seaman other than his knowledgeable acceptance of a dangerous condition." 636 F.Supp. at 1036.

The district court then discussed seven factors that it took into account in allotting fault on a comparative basis. Among them were the fact that Mr. Burden could have requested help from the "call watch" deckhand if needed; the fact that Mr. Burden was aware of the proper method of carrying a coiled cable, having learned the "shoulder" technique through on-the-job training when he first began working as a deckhand; and the fact that although Mr. Burden had sufficient time to evaluate the difficulty of his task, he had admitted to getting in a hurry and moving the cables by a method he had never used before. The court said it was on the basis of these findings, "and the determination that a safe alternative was available to plaintiff after assuming the risk of working with unsafe equipment," that responsibility was being apportioned 80% to the plaintiff and 20% to the defendant. 636 F.Supp. at 1036.

Quoting the district court's language about "assuming the risk of working with unsafe equipment," the plaintiffs argue on appeal that the court found that Mr. Burden was contributorily negligent because he "undertook to perform work ordered;" the plaintiffs assert that the district court thus "invoked against the Plaintiff the doctrine of assumption of risk that is inapplicable as a matter of law in this maritime action."

It is certainly true, as the plaintiffs argue, that it is a "basic tenet of maritime law that assumption of risk is not, in any form, ... a defense to a seaman's action for personal injury as a result of unseaworthiness or Jones Act negligence." The district court clearly recognized this basic tenet, however, quoting from our opinion in *Tolar* and stating that it is "imperative", if the vessel owner is to escape liability for 100% of the damages, that there be evidence of negligent conduct on the part of the seaman *"other than* his knowledgeable acceptance of a dangerous condition." (Emphasis supplied.) Although the district court said that a safe alternative was available to plaintiff "after assuming the risk of working with unsafe equipment," that language simply reflects our statement in *Tolar* that "we must focus on [the seaman's] actions after he assumed the risk of working with the defective rig...." *Tolar* does not in any way suggest that assumption of the risk is a defense—we specifically said that "assumption of risk is not a defense" —and the district court was not laboring under any misapprehension on this point.

The plaintiffs argue that Mr. Burden "was not contributorily negligent for undertaking to perform the work assigned him," and that is obviously correct. But the district court did not fault Mr. Burden

for undertaking to perform the work; it faulted him for undertaking to perform the work in an improper and unsafe method when a safe alternative was, as he knew, available to him. *Cf. American President Lines, Ltd. v. Welch,* 377 F.2d 501 (9th Cir.), *cert. denied,* 389 U.S. 940, 88 S.Ct. 294, 19 L.Ed.2d 292 (1967) (seaman held contributorily negligent for failing to request help in moving heavy parts).[*]

The second branch of the plaintiffs' argument on the contributory negligence question is that "the trial court clearly erred in finding the plaintiff contributorily negligent because he did not (A) seek help from a sleeping call-watch deckhand or (B) use his shoulder to do the work."

As to Mr. Burden's failure to use the shoulder technique in moving the coiled cables, plaintiffs argue that "[a]lthough two men lifting the cables would have reduced the risk of spinal injury from the work to a reasonable level ... the evidence produced at trial showed that the Defendant had stacked the cumbersome, bulky coils at such location on the vessel, and in such manner, that obtaining help to move them was neither practical nor feasible...." It seems to us, however, that the plaintiffs are confusing the task of freeing the snagged coil with the task of moving the coil laterally to the nearby barge. The district court found, properly, that the lateral movement was a one-man job. There was no finding that two men could not usefully have been employed in the job of lifting the snagged coil off the top of the pile, however, and we are aware of no evidence that would compel such a conclusion. (The photographs on which the plaintiffs rely were taken two years after the accident, and they do not purport to depict the conditions that existed on the deck of the barge on August 13, 1980.)

The plaintiffs go on to argue that "[e]ven if the circumstances of the work had been such as to make help feasible, help was not at hand. The call-watch deckhand was not on deck. It was not the Plaintiff's duty to stop the work he alone had been ordered to perform and go to seek out help."

As a factual matter, however, the district court found that the call-watch deckhand was available to help if needed, and Mr. Burden had authority to request such help. The point of having a call-watch, after all, is for the person who is serving on that watch to be callable in case of need. Mr. Burden did testify that his brother, the captain, had told him to let the call-watch deckhand "sleep as much as possible," with plaintiff Burden "to do as much as possible by myself." But the flip side of the instructions contains an implicit suggestion that Mr. Burden ought to have called the sleeping deckhand when he ran into a problem, or ought to have suspended his coil-moving operations until there were two men available on deck to lift the snagged coil off the pile. Given the factual circumstances presented here, none of the cases cited by the plaintiffs suggests that it was proper for Mr. Burden to bend over and try all by himself to lift a snagged coil weighing nearly 100 pounds.

The plaintiffs also argue that because Mr. Burden was injured while getting the snagged coil free, the district court was remiss in failing to "address the question of how the Plaintiff could have used his shoulder to free the stuck coil...." As our recitation of the facts has shown, however, there were two separate and distinct points at which Mr. Burden experienced pain in his back; the first was when he lifted the coil off the pile, and the second was when he threw the coil onto the barge after having dragged it to the edge of the tugboat. No one ever suggested that Mr. Burden ought to have used the shoulder to free the stuck coil. What the evidence clearly did indicate was that Mr. Burden ought to have obtained help in freeing the stuck coil—and once it had been freed, he ought to have carried the coil over to the tugboat on his shoulder. If he had got help, Mr. Burden would not have hurt his back while lifting the coil off the pile; and if he had then carried the coil over to the

---

[*] The district court did not find that Mr. Burden was negligent in proceeding with his assigned task after he had discovered that one of the coils was snagged, but given the nature of the captain's instructions, it seems to us that this might well have been deemed contributory negligence also. In *Hall v. American S.S. Co.,* 688 F.2d 1062 (6th Cir.1982), where a seaman was held not to have been guilty of contributory negligence in continuing an assigned task after rough weather arose, an instruction to leave the deck in the event of rough weather had not been passed along to the seaman. In the case at bar, on the other hand, the instruction to do only as much of the assigned task as possible had been given directly to plaintiff Burden by his brother.

barge on his shoulder, rather than dragging it to the edge of the tug and "tossing" it across, there is no reason to suppose that Mr. Burden would have injured his back in the transfer from tug to barge.

Plaintiffs contend that "there was no showing by the Defendant that carrying the cable on the Plaintiff's shoulder after he stood it on the deck would have been a safe practice insofar as the risk of spinal injury was concerned," but the defendant did introduce expert testimony showing that the standard method of carrying coiled cables was by shouldering them, the use of this method being "a rule on towboats...." In light of this testimony, and because the trial judge, sitting as a factfinder, was entitled to use his own experience and common sense in determining the relative safety of throwing a heavy weight and carrying such a weight on the shoulder, we cannot say that the district court's findings were clearly erroneous.

## II

In the portion of the trial court's opinion reported at 636 F.Supp. 1036–43, the court presented a careful and detailed analysis of the extent of Mr. Burden's pre-trial wage loss and post-trial diminution of earning capacity. Central to the court's analysis was a finding that Mr. Burden was capable of doing sedentary or light work and ought to be able to find a minimum wage job in the geographical area where he lived.

In challenging the trial court's analysis, the plaintiffs argue that the trial court applied the Social Security test for determining total disability—a test held inapplicable to maritime cases in *O'Shea v. Riverway Towing Co.*, 677 F.2d 1194, 1197 (7th Cir.1982)—and failed properly to evaluate the likelihood that Mr. Burden would be able to find gainful employment.

The trial court explicitly adopted the *O'Shea* standard for determining total disability, and although it is possible that other judges might have weighed the evidence differently, we find no basis on which it would be proper to conclude that this judge's assessment of Mr. Burden's employment prospects was clearly erroneous. The opinion reflects a careful and workmanlike job on the part of the district judge, and we shall not disturb his findings.

## III

The trial court found the tugboat unseaworthy and the owner negligent because some of the coiled towing cables had shackles attached, and in this condition, as the court found, the cables were not safe for the use Mr. Burden was directed to make of them. The defendant asserts that the only shackles left on the cables had been left there because it was physically impossible to remove them; that there was no expert testimony showing that the presence of such shackles created an unsafe condition; and that Mr. Burden could not say that the particular cable he was moving at the time of his injury had a shackle on it.

We do not find the defendant's arguments persuasive. For whatever it might have been worth, there was testimony that it was physically possible to remove any shackle with a cutting torch—and such a torch was part of the equipment carried on this tugboat. The defendant might not have been under any duty to remove the shackles by use of a torch, but having elected not to do so, the defendant was arguably under a duty to take greater pains with the storage and handling of the unstripped cables. There was no need for expert testimony on the shackles' creating an unsafe condition; it is clear that two of the coils were in fact caught together, and that this made plaintiff Burden's task more dangerous. We cannot see that it makes any difference which particular coil had the shackle, as long as the presence of a shackle and chain on some coil caused the snagging that prevented Mr. Burden from pulling the top coil off the pile in the usual manner. The finding that the defendant bore legal responsibility for the condition of the pile of coiled cables was not clearly erroneous, and although the evidence of negligence and unseaworthiness was slight, it was sufficient to support a finding of liability in a maritime case of this character.

For the foregoing reasons, and on the basis of the trial court's excellent opinion, the judgment appealed from is, in all respects, AFFIRMED.